1

2

3

4

5

6

7

8                            UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    DEZESTIA SHANE TAYLOR,                      No.  2:22-cv-01114-WBS-EFB (HC)

12                    Petitioner,

13         v.                                     FINDINGS AND RECOMMENDATIONS

14    T. CISNEROS, Warden,

15                    Respondent.

16

17         Petitioner is a state prisoner proceeding without counsel in this petition for a writ of

18    habeas corpus.  28 U.S.C. § 2254.  He challenges his 2017 convictions for attempted voluntary

19    manslaughter and firearms charges.  ECF No. 1 at 1.  Petitioner alleges that: (1) erroneous

20    evidentiary rulings by the trial court deprived him of his Sixth and 14th Amendment rights to

21    present a complete defense; (2) the prosecution committed misconduct and violated petitioner's

22    Sixth and 14th Amendment rights when it immunized the victim but not petitioner's companion

23    during the crimes; and (3) the cumulative errors of the trial court and the prosecution denied him

24    due process.  *Id*. at 4-5.  For the reasons that follow, the petition must be denied.

25    /////

26    /////

27    /////

28    /////

1

1

## I.  Background

2        The facts, as relayed by the California Court of Appeal[1], are:

3        In August 2017, defendant and two companions drove to a Sacramento County
         store, parked in front of it, and went inside. A short time later, Parker [the gunshot
4        victim] drove past the store in his blue Camaro, parked his car, and entered the
         store. Seconds later, defendant and Parker left the store and fought each other
5        while defendant's two companions looked on.

6        When the fight ended, Parker went back into the store and defendant and his
         companions sat in the car parked in front of the store. After purchasing an item,
7        Parker left the store, walked to the front passenger side of the car where defendant
         was seated, punched defendant through the open window, twice slammed shut the
8        front passenger door when defendant tried to open it, and then walked away,
         passing the rear of the car.
9
         Defendant obtained a firearm from one of his companions in the car, got out of the
10       car, took four or five steps away from the front passenger seat, bringing him past
         the trunk of the car, and fired six times in Parker's direction, striking Parker in the
11       back of his upper leg. Defendant hurried back into the car, which immediately
         sped away.
12
         Most of this was captured on video. Not captured on video was where Parker and
13       his blue Camaro were when defendant shot Parker, and what Parker said after
         striking defendant through the open window before he walked away.
14
         ***People's Case***
15       A motorcyclist who saw the incident while wearing his full-face helmet, testified
         that Parker did not have anything in his hands and was not near any car when
16       defendant fired his weapon.

17       After initially stating that he had "nothing to say" and was testifying "so [he]
         wouldn't have a failure to appear," Parker explained that he did not know
18       defendant (or defendant's two companions who were inside the store when Parker
         entered), and insisted that he did not remember much about the incident. [footnote
19       omitted].

20       Parker admitted he had a firearm inside his car at the time of the incident. Parker
         further testified that "since this" incident, he "pled to" "misdemeanor possession
21       of a gun." Parker said that he did not ever possess, use, or reach for his gun at the
         store.
22
         On cross-examination, Parker admitted that he "had a gun in a bag in Richmond"
23       nearly a year after the Sacramento shooting, and replied in the negative to defense
         counsel's question, "You generally carry a gun when you go places, right?"
24       Defense counsel pressed Parker: "So just those two days when the cops happened
         to look in your bag, that's the only days you had a gun?" Parker replied: "Yes, sir."
25       In addition to insisting he did not know defendant, Parker testified he did not know
         someone named Calvin Gardner, who later was identified as defendant's cousin,
26       and who testified for the defense as a witness.

27       ───────────────
              [1] The facts recited by the state appellate court are presumed to be correct where, as here,
28       the petitioner has not rebutted the facts with clear and convincing evidence.  28 U.S.C. §
         2254(e)(1); *Slovik v. Yates*, 556 F.3d 747, 749 n.1 (9th Cir. 2009) (as amended).

A detective who interviewed Parker and defendant testified that both men told the detective they did not know each other.

***Defendant's Case***

Defendant testified that he knew Parker (a) through a youth football team they played on together for two years beginning when defendant was about 12 years old, and (b) because Parker "used to come over to [Gardner's] house ... a lot," and spent the night at that house with defendant and his cousin "[o]ver a dozen" times.

Defendant said that his relationship with Parker began to deteriorate after a graduation party a few years before their August 2017 encounter, when defendant and Gardner asked a group of people including Parker to "calm down" because they were "getting a little loud and arguing with people."

The group "got mad" at defendant and Gardner and surrounded defendant's car so he could not leave. Parker "tried to run up and fight" defendant. "[O]ne of [Parker's] friends ... talk[ed] about going to get a gun," which made defendant feel "scared and threatened."

Defendant testified to five additional confrontations he had with Parker and Parker's associates between the graduation party and the August 2017 shooting. The first confrontation occurred at a light-rail station. Defendant was again encircled and threatened by a group of people, including Parker. Someone pulled on defendant's shirt and tried to "yank [him] to the ground."

Next, defendant and Gardner were walking to Gardner's parents' house after attending a friend's party that Parker and his associates also attended. Parker and two others followed defendant and Gardner in Parker's car, and then Parker fired shots "towards the house." Bullets struck windows and the house's garage.

In late 2015/early 2016, Parker bumped defendant inside a library, and challenged him to "come outside into the parking lot." Defendant declined, and Parker later "tried to swing on [defendant] with his fists."

In 2016, defendant, Gardner, and two friends drove to a gas station store and saw Parker and two of his companions. Parker and his companions challenged defendant to "come outside," and defendant agreed in "the heat of the moment." But Parker's group "didn't fight," and defendant and his group drove around the corner to his aunt's house. Fifteen minutes later, as defendant and his group sat in a car in the driveway of the house, Parker and two others "[came] up behind the car" and then about 30 "shots rang out," as bullets struck the car, the front door, and window of the house. Parker fired shots from one gun, one of his companions fired shots from a second gun. Defendant saw social media postings about the shooting by two of the people in Parker's group.

Another time in 2016, defendant was with his son's mother Kayla Hooper when Parker, travelling in his blue Camaro, "tried to run [defendant] off the road," forcing defendant to "veer into the ongoing traffic."

Defendant also testified that Gardner told him about a confrontation between Gardner and Parker, during which Gardner broke his hand.

Defendant said he "moved locations" twice because of fear of Parker.

3

Defendant said that he initially lied to the police (by telling them that he did not know Parker) because (a) he was scared that he would be assaulted while incarcerated for being a "snitch," (b) he had a suspended state prison sentence that he feared would be triggered by his involvement in the altercation with Parker, and (c) police are "not always there to help," and "want you to incriminate yourself sometime[s]."

Defendant admitted that he suffered multiple criminal convictions, including corporal injury on a spouse (Hooper), arising out of a single prosecution in 2015. Defendant explained that, while "some of the things that [he] did in that case were actually true," "some were false." Specifically, defendant insisted that he did not use a firearm during an altercation with Hooper.

Providing his version of the August 2017 shooting, defendant explained that when he went to the store with his two companions, he did not have a gun, he did not know that either of his companions had a gun, and he had no idea that he would see Parker there. When Parker entered the store, he "told [defendant] to come off the camera," but Parker replied: "No. We can go outside and fight if you want." Defendant's "heart ... fell to [his] stomach," and he was afraid, because of "flashbacks of the times when [Parker] shot at [him] before." Defendant "knew that" Parker was not carrying a weapon "on him" when he was in the store, because of the clothes Parker was wearing.

When defendant and Parker exited the store to fight, defendant saw Parker's blue Camaro "maybe like three yards" away from the car that defendant arrived in that was parked in front of the store. The cars were parked "trunk to trunk." The video footage introduced at trial showed the car that defendant arrived in, but Parker's blue Camaro was "just right outside of" the surveillance camera's view.

Before defendant and Parker fought, Parker "stuck his arm in" "his passenger side window" and "told [defendant] to get off camera." Defendant said: "No." "Are we fighting?" Parker replied: "Yeah. Fuck it. And he ran up and swung at [defendant]," and the two fought.

The fight ended when defendant told Parker he "was tired and ... done fighting." Parker went back inside the store, and defendant asked his friend "to drive off." But his friend "just sat there," and since it wasn't defendant's car, he couldn't tell his friend "when to start his car and go."

Defendant didn't notice when Parker exited the store and approached the front passenger window. After Parker "sucker-punched" defendant while he was seated inside the car, and "[s]lammed the door on" defendant's leg, defendant said to his friend, "Hurry up and drive."

Parker said: "That's what we're doing? I'm going to smoke your bitch ass, boy," meaning Parker was "going to get a gun" and "going to shoot" defendant. As Parker "sidestepped ... to the driver's side of his vehicle," defendant told his friend to "drive off," and his friend "pulled out a gun and said, What for?" Defendant said, "Well, you need to do something because he's going to get a gun now." Defendant's friend "still didn't start the car, so that's when [defendant] grabbed the weapon, and ... got out of the car." Parker "was already reaching into his window -- his driver's side window, and that's when [defendant] fired."

Defendant said he did not shoot towards Parker because he was mad, but because Parker had threatened that he was going to kill defendant. Defendant was

4

"positive" Parker was reaching inside his car, through the window opening. Defendant thought Parker was "grabbing his weapon."

Defendant was not aiming at Parker when he fired the gun. He was aiming at the mirror on the driver's side door "to scare [Parker] to get out of his car, to get away from" defendant, so defendant "could have time to leave" without Parker "being able to get in the car and chase" defendant. Defendant believed he had to shoot. On cross-examination, defendant insisted he did not shoot toward Parker in order to maintain his respect in front of his friends, but rather out of fear. When the prosecutor asked if the prior contacts with Parker were "all fabricated," defendant said no.

Three witnesses testified for defendant.

1.    Gardner testified that he used to be friends with Parker, and that Parker spent the night at Gardner's house when defendant was also there "[a]bout three times." Their friendship ended when Parker and his friends caused "a little commotion" at Gardner's girlfriend's 2014 "graduation party."

About three months after the graduation party, Gardner was with defendant outside Gardner's mother's house, when he saw Parker inside a car from which shots were fired.

In a separate incident that defendant was not present at, about five minutes after Gardner and his friends "bumped into" Parker and his friends at a store, "32 shots rang out, two shooters." Gardner didn't see who did the shooting, but he "kn[e]w" it was Parker. Gardner told defendant that Parker was a dangerous person.

On cross-examination, Gardner admitted that he was convicted of felony residential burglary and felony domestic violence.

2.    Defendant's aunt, Nicole Sowells, testified that she knew Parker because he "spent a lot of time at [her] family home, stayed the night, holidays, football practices." Sowells testified that defendant told her about a shooting involving Parker in February 2015, wherein "Parker and his friends" "shot at" defendant. Sowells remembered the date because she "posted" about it on social media.

3.    Defendant's cousin, Shaneika Gardner, testified that she knew Parker "well" and that sometime in 2014, Parker "was driving a Camaro" and she saw him shoot "in the air" when she was outside her home with her "boys" who had just returned from a party nearby.

On a different occasion, defendant told her that Parker "was shooting" at a party where defendant was present.

***People's Rebuttal Evidence***
In rebuttal, the People called Hooper, defendant's son's mother, who testified that in October 2015 she did *tell* police that defendant (a) threw her to the ground, and (b) put a gun in her mouth, but that she had "made it all up," because she was "fed up with" defendant. She and defendant "were just shoving each other back and forth." She also testified that, in March 2017, she falsely told police that defendant threw a brick through her car window. Hooper said she lied to the police in March 2017 because she knew defendant had a "suspended sentence" in a "prior case," and she wanted him "to go away for a while."

5

1  Under questioning by defense counsel, Hooper testified that in 2016 or 2017,
   Parker chased and threatened her and defendant, causing defendant to drive at high
2  speeds and on the wrong side of the road.

3  ***Closing Arguments***
   The prosecutor argued that defendant "got punked. He got hit through a window.
4  He got sucker-punched, and it pissed him off. And now ... he shoots and he tries to
   kill" Parker. "When someone shoots six rounds ... common sense is ... [t]hat dude
5  was trying to kill that dude."

6  The prosecutor characterized "the whole focus" of the defense case, as "paint[ing]
   ... Parker as violent as they possibly could." Though defendant "gave ... examples
7  of ... Parker's violence," defendant was "a liar. We know that. He's admitted it.
   He's got the motivation to mislead. And is anything he's saying corroborated? ...
8  [¶] We had ... Sowells. She was the aunt.... Well, it's a family member.... And
   clearly, family members want to help out other family members."
9
   "Next was Calvin Gardner." "He's a cousin, a family member." "Then to ...
10 Shaneika Gardner, again, a cousin." "Kayla Hooper ... talked about being chased"
   by Parker. "[S]he's the mother of [defendant's] child. So obviously she's got a bias
11 to help him out."

12 Defense counsel argued defendant acted in self-defense as Parker was "reaching in
   his car." Defense counsel urged the jury to consider "what's in [defendant']s head"
13 at the moment he shot Parker, including that Parker "shot at his cousin," and "shot
   at his grandma's house or aunt's house." Defendant knew that "Parker is usually
14 strapped," "known to carry guns, and lo and behold, he had one in the car that
   day."
15
   ***Verdict and Sentencing***
16 The jury found defendant not guilty of attempted murder (Pen. Code, §§ 664/187,
   subd. (a)), but guilty of attempted voluntary manslaughter (Pen. Code §§ 664/192,
17 subd. (a); count one), assault with a semiautomatic firearm (Pen. Code, § 245,
   subd. (b); count two), and being a felon in possession of a firearm (Pen. Code, §
18 29800, subd. (a)(1); count three). In connection with count two, the jury found true
   that defendant used an automatic firearm within the meaning of Penal Code
19 section 12022.5, subdivisions (a) and (d), and found not true that defendant
   personally inflicted great bodily injury upon Parker.
20
   Later, defendant admitted two prior strike convictions, and the trial court granted
21 the prosecution's motion to dismiss one of the strikes in the interest of justice.
   The trial court sentenced defendant to an aggregate prison term of 22 years,
22 consisting of: the middle term of 6 years on count two, doubled to 12 years
   because of the prior strike; plus the upper term of 10 years for the firearm
23 enhancement associated with count two. Pursuant to Penal Code section 654, terms
   of 7 years (count one) and 4 years (count three) were imposed but stayed.
24
25 *People v. Taylor*, No. C088867, 2021 WL 957596 (Cal. Ct. App. Mar. 15, 2021*), review

26 denied* (May 26, 2021); ECF No. 11-9 at 2-9.

27 /////

28 /////

6

1    In all aspects relevant to the instant petition, petitioner's appeal of his conviction was

2    rejected by the state appellate court.  ECF No. 11-9.  The California Supreme Court denied

3    review.  ECF No. 11-11.

4    **II.  Analysis**

5    *A.  Standards of Review Applicable to Habeas Corpus Claims*

6    An application for a writ of habeas corpus by a person in custody under a judgment of a

7    state court can be granted only for violations of the Constitution or laws of the United States.  28

8    U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

9    application of state law.  *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010); *Estelle v. McGuire*, 502 U.S.

10   62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

11   Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

12   corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable
>     application of, clearly established Federal law, as determined by the Supreme
>     Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
>     facts in light of the evidence presented in the State court proceeding.

20   Under § 2254(d)(1), "clearly established federal law" consists of holdings of the United

21   States Supreme Court at the time of the last reasoned state court decision.  *Thompson v. Runnels*,

22   705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, __ U.S. __, 132 S.Ct. 38 (2011);

23   *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362,

24   405-06 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly

25   established and whether a state court applied that law unreasonably."  *Stanley*, 633 F.3d at 859

26   (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not

27   be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific

28   legal rule that th[e] [Supreme] Court has not announced."  *Marshall v. Rodgers*, 569 U.S. 58, 64

1   (2013) (citing *Parker v. Matthews*, 567 U.S. 37, 47-49 (2012) (per curiam)).  Nor may it be used

2   to "determine whether a particular rule of law is so widely accepted among the Federal Circuits

3   that it would, if presented to th[e] [Supreme] Court, be accepted as correct."  *Id.*  Further, where

4   courts of appeals have diverged in their treatment of an issue, there is no "clearly established

5   Federal law" governing that issue.  *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

6         A state court decision is "contrary to" clearly established federal law under § 2254(d)(1) if

7   it applies a rule contradicting a holding of the Supreme Court or reaches a result different from

8   Supreme Court precedent on "materially indistinguishable" facts.  *Price v. Vincent*, 538 U.S. 634,

9   640 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court

10  may grant the writ if the state court identifies the correct governing legal principle from the

11  Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

12  case.[2]  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*,

13  360 F.3d 997, 1002 (9th Cir. 2004).  A federal habeas court "may not issue the writ simply

14  because that court concludes in its independent judgment that the relevant state-court decision

15  applied clearly established federal law erroneously or incorrectly.  Rather, that application must

16  also be unreasonable."  *Williams*, 529 U.S. at 412; *accord Schriro v. Landrigan*, 550 U.S. 465,

17  473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its

18  independent review of the legal question, is left with a 'firm conviction' that the state court was

19  'erroneous.'").  "A state court's determination that a claim lacks merit precludes federal habeas

20  relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

21  decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541

22  U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal

23  court, a state prisoner must show that the state court's ruling on the claim being presented in

24  federal court was so lacking in justification that there was an error well understood and

25  /////

26  _____

27      [2] Under § 2254(d)(2), a state court decision based on a factual determination is not to be
    overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
    presented in the state court proceeding."  *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*,

28  384 F.3d 628, 638 (9th Cir. 2004)).

8

1    comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562

2    U.S. at 103.

3         If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

4    court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*,

5    527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

6    (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

7    2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

8    de novo the constitutional issues raised.").

9         In evaluating whether the petition satisfies § 2254(d), a federal court looks to the last

10   reasoned state court decision. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044,

11   1055 (9th Cir. 2004).  If the last reasoned state court decision adopts or substantially incorporates

12   the reasoning from a previous state court decision, the court may consider both decisions to

13   ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir.

14   2007) (en banc).  "When a federal claim has been presented to a state court and the state court has

15   denied relief, it may be presumed that the state court adjudicated the claim on the merits in the

16   absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at

17   99.  This presumption may be overcome by a showing "there is reason to think some other

18   explanation for the state court's decision is more likely." *Id*. at 99-100 (citing *Ylst v.*

19   *Nunnemaker*, 501 U.S. 797, 803 (1991)).  Similarly, when a state court decision on a petitioner's

20   claims rejects some claims but does not expressly address a federal claim, a federal habeas court

21   must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. *Johnson*

22   *v. Williams*, 568 U.S. 289, 293 (2013).

23        Where the state court reaches a decision on the merits but provides no reasoning to

24   support its conclusion, a federal habeas court independently reviews the record to determine

25   whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v.*

26   *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo

27   review of the constitutional issue, but rather, the only method by which we can determine whether

28   a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853.  Where no

1  reasoned decision is available, the habeas petitioner still has the burden of "showing there was no
2  reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 99-100.

3        When it is clear, however, that a state court has not reached the merits of a petitioner's
4  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal
5  habeas court must review the claim de novo. *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462
6  F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

7        *B.  Petitioner's Claims*

8        Petitioner asserts three claims in this petition, which the court will analyze in turn.

9        *i.  Claim I*

10        First, petitioner claims that the trial court made numerous erroneous evidentiary rulings,
11  resulting in the denial of his due process right to a complete defense.  Specifically, petitioner
12  challenges the exclusion of the following evidence: 1) victim Parker's 2018 firearm charges; 2)
13  petitioner's testimony regarding threats made by Parker's associates; 3) testimony regarding
14  petitioner's fear of Parker from three witnesses (Dorsey, Robinson, and Davis); and 4) social
15  media posts from Parker and his associates.  The state appellate court found that petitioner was
16  not denied his right to a complete defense and that any evidentiary error was harmless:

17
18      Defendant argues erroneous evidentiary rulings by the trial court deprived
    defendant of his Sixth and Fourteenth Amendment rights to present a complete
19      defense. Specifically, defendant argues that because "the jury was struggling to
    determine whether" he acted in complete or incomplete self-defense, it was
20      important for defendant to be able to show that his beliefs (that Parker had a
    violent history and was walking to his Camaro to obtain a gun to shoot defendant)
21      were reasonable, by "bolster[ing] [his] credibility, which was badly damaged by
    the fact he lied during his police interview, and to anticipate the prosecutor's
    argument that [defendant's] testimony was uncorroborated."
22
    Defendant assigns error to the trial court's evidentiary rulings in "four general
23      subject areas: (i) use of Parker's 2018 firearm charges; (ii) sustained objections
    during [defendant's] testimony concerning threats by Parker's associates; (iii)
24      limiting additional corroborating witness testimony; and (iv) social media posts."
    The People argue the trial court did not err, and if it did, the error was not
25      prejudicial, "given the totality of the evidence presented at trial."

26      We conclude defendant has forfeited on appeal his claims regarding the testimony
    of two corroborating witnesses. We further conclude that any error by the trial
27      court that defendant identifies was harmless.

28  /////

                                        10

**A. *General Principles***

Evidence Code section 1103, subdivision (a) provides in relevant part: "In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character." Even if proffered evidence is relevant and admissible under section 1103 the trial court may exclude such evidence under section 352. (See *People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1456-1457.)

Section 352 gives the trial court discretion to exclude evidence if its probative value "is substantially outweighed by the probability that its admission will ... necessitate undue consumption of time or ... create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352; see *People v. Hardy* (2018) 5 Cal.5th 56, 87 [" 'In general, the trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value' "].)

"[S]ection 352 must bow to the due process right of a defendant to a fair trial and his right to present all relevant evidence of significant probative value to his defense." (*People v. Burrell-Hart* (1987) 192 Cal.App.3d 593, 599.) But error in evidentiary rulings, "even if error under state law, violates due process only if it makes the trial fundamentally unfair." (*People v. Partida* (2005) 37 Cal.4th 428, 436.)

"Although completely excluding evidence of an accused's defense theoretically could rise to th[e] level" of an unconstitutional deprivation of the right to present a defense, a rejection of only " 'some evidence concerning the defense' " requires review under *People v. Watson* (1956) 46 Cal.2d 818, 836, "not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103; see *People v. Bradford* (1997) 15 Cal.4th 1229, 1325 [a "trial court's ruling ... merely reject[ing] *certain* evidence concerning the defense," by itself, is *not* "a refusal to allow defendant to present a defense", italics added].)

**B. *Alleged Erroneous Rulings***

**1. *Parker's 2018 Possession of a Firearm***

At the in limine hearing, the parties and the trial court discussed the relevance of Parker's possession of a firearm in July 2018, months after defendant shot Parker. Defense counsel indicated that he wanted to use the episode to show Parker's violent and dangerous character, to impeach Parker generally, and to corroborate defendant's "state of mind" at the time of the August 2017 shooting.

The trial court ruled that, "under section 1103, it's ... not admissible," and that under section 352 the probative value of the evidence was "far outweighed, substantially outweighed by its prejudice to confuse the jury." But later, after some witnesses testified, the trial court ruled that defendant *could* use the July 2018 firearm possession "for purposes of impeachment only." And then, when providing instructions to the jury, the trial court explained that "certain evidence was admitted for a limited purpose," and that if the jury found "that a witness has committed a crime or other misconduct," the jury could "consider that fact only in evaluating the credibility of the witness' testimony."

11

Defendant contends this was "an abuse of discretion," because the July 2018 possession of a firearm was probative of Parker's "reputation for 'being strapped.'" "[H]ad ... the jury been able to consider that Parker's repetitive possession of a firearm ... reflected a character for violence," defendant argues, it is reasonably probable that defendant would have obtained at least a hung jury on the attempted voluntary manslaughter and assault counts.

### 2. *Threats Made by Parker's Associates*

The trial court sustained the prosecutor's objections to testimony that defense counsel tried to elicit from defendant regarding (a) threats to defendant by Parker's associates, and (b) defendant's knowledge of the content of social media activity by Parker's associates about a shooting involving defendant. Defendant contends those rulings were an abuse of discretion because threats by those "'reasonably associated with'" Parker were relevant to the jury's evaluation of defendant's beliefs when he shot Parker.

Because "it appears the jury likely convicted on the theory of imperfect self-defense," defendant maintains that "[a] few more minutes explaining why [defendant] was afraid of Parker may have convinced one or more jurors that [defendant] did have objectively reasonable beliefs to justify his shooting at Parker."

### 3. *Exclusion of Testimony of Three Corroborating Witnesses*

On several occasions, the parties and the trial court discussed the extent to which the trial court would allow defendant to present witnesses to corroborate his testimony that he feared Parker's violence. Early on, the trial court indicated that it would exclude as hearsay statements that defendant made to witnesses that he was afraid of Parker. Later, when defense counsel explained that, in order to "show state of mind" during the August 2017 shooting, he wanted to have "[f]amily members ... come in and confirm that they actually received" "information from [defendant] back then" that Parker was "bullying" defendant, the trial court responded: "I think it's very confusing, and I think that it sounds like the number of people you want to come testify about that is also excessive." And later still, the trial court expressed a willingness to permit witness testimony "that ... only speaks to the credibility or veracity of the defendant, and it's not offered for the truth asserted."

### i. *Lakea Dorsey*

Defense counsel initially explained that he wanted to call Lakea Dorsey to the stand in order to "corroborate the fact that [defendant] said who it was back then" whose "house was shot up." It appeared that Dorsey did not directly observe the shootings, but learned that Parker was involved afterwards, when someone told her. The trial court reserved its ruling, observing that, because defendant observed Parker shoot the house and was going to testify about it, "[i]t may not be necessary ... to receive any information from ... Dorsey."

After defendant testified, defense counsel told the trial court that Dorsey was among the witnesses that he wanted to call to the stand. The trial court addressed defense counsel, "unless you can tell me -- and you haven't been able to tell me yet -- that the information upon which" the witnesses, including Dorsey, "are relying is based on their own personal observations as it relates to ... Parker, and how that ties to [defendant's] knowledge that ... Parker is a bad dude, it's not trustworthy. So I'm disinclined to allow it."

12

After a recess, the trial court told defense counsel she wanted to "revisit some of the witnesses that [he] plan[ed] to call." The trial court asked defense counsel "what would [Dorsey] testify about?" Defense counsel replied: "I excused her. She was in the house that got shot up that we've already had testimony about."

### ii. *Beverly Robinson and Gwendolyn Davis*

During the in limine hearing, the trial court told defense counsel that "right now, any statements of Gwendolyn Davis, Shan[eika] Gardner, Beverly Robinson, about what it was that [defendant] conveyed to them about how he was afraid, how he saw ... Parker following him, those are clearly hearsay, would not be admissible. And I'm not going to allow those."

Later, regarding those three witnesses, and after defendant testified, defense counsel told the trial court that he wanted to call Gwendolyn Davis and Shaneika Gardner, not mentioning Beverly Robinson. Defense counsel explained that Gwendolyn Davis was going to testify that "she kn[ew]" Parker's name "and that the defendant moved in with her."

The trial court and defense counsel discussed their recollections of the trial court's earlier determinations about which defense witnesses were "out" and which would be permitted to testify. During that exchange, the trial court said: "Beverly Robinson is out, Gwendolyn Davis was out, and Shaneika Gardner was out." Defense counsel replied: "I strongly disagree with that characterization. I thought we had just limited portions what you were going to allow in."

The trial court and defense counsel agreed that the trial court ruled at the in limine hearing that defense counsel "couldn't get into the incidents" that Shaneika Gardner "was not personally aware of," but they did not agree on what the trial court ruled regarding Gwendolyn Davis.

The trial court addressed defense counsel: "[T]he other evidence that you plan to offer, Gwendolyn Davis, I think is duplicative of evidence that is already before this jury. It's going to inject the jury with additional information that ... I am not confident is trustworthy, because it's based on ... hearsay .... [¶] I'm going to allow you, for the limited purpose to go towards [defendant's] credibility, the evidence I indicated before. But to add more is not necessary and is collateral."

The following exchange occurred:

The court: "I already said Gwendolyn Davis is out."

Counsel for defendant: "You did not. You actually specifically said I could still call her, but you limited down what I was originally intending to call her for on the record."

The court: "We can read back the -- I thought Gwendolyn Davis I had ruled out...."

Counsel for defendant: "Otherwise, I wouldn't have her sitting in the hallway, as I do."

The court: "All right. Let's just go ahead and proceed, and if there's an objection, I'll entertain the objection, and we'll proceed accordingly. [¶] I've already made the [c]ourt's position known."

13

Shaneika Gardner testified (as outlined above in the Background section, *ante*), and no further discussion appears on the record regarding Gwendolyn Davis.

Defendant contends the trial court abused its discretion when it "exclude[d] the three additional relatives" Lakea Dorsey, Beverly Robinson, and Gwendolyn Davis, because it thereby "limit[ed] evidence of [defendant's] defense," as the three witnesses "were intended to corroborate the timeline of harassment [defendant] described in his testimony by presenting information within their personal knowledge of" defendant's and Parker's "conduct at the time."

### 4. *Exclusion of Social Media Posts*

Before defendant testified, the trial court said it was "disinclined to allow" certain "photographs, the Facebook postings" of Parker and his associates because the probative value of the images was "substantially outweighed by their prejudice ... because of the undue consumption of time, danger of confusing the issues for the jury."

Defense counsel maintained that the social media images were "important for [the] argument" that "defendant received a threat from someone else that he has reasonably associated with ... Parker," because for "each one of the photographs [counsel] was going to have [defendant] look at, he would tell about an incident. He would name names of the people that ... Parker was with and identify people from photograph[s] as those people to put a face to the name."

Later, the trial court replied, "I don't think you need to have a face to the name in order to make the point you're trying to make."

Defendant contends the trial court abused its discretion because the social media postings were "evidence relevant to the issue of whether [defendant] had been the subject of threats from individuals he reasonably associated with Parker." Further, defendant maintains, "the photographs are helpful, not only to explain the threats" that defendant received from Parker's associates, "but also to show the jury the public posture that Parker and these associates take." "A reasonable juror looking at" the photos "could find that Parker was ... the type of individual who could not lose face after a fight and was walking to his car to reach for the gun known to be in the car at the time."

### C. *Analysis*

#### 1. *Forfeiture of Claims Regarding Dorsey and Robinson*

We agree with the People that defendant has forfeited on appeal his claims the trial court improperly "excluded" the testimony of Lakea Dorsey and Beverly Robinson. The record reflects tentative rulings by the trial court and evolving discussions between defense counsel and the trial court regarding their potential testimony. But the trial court made no definite decisions regarding Dorsey and Robinson, and defense counsel did not press for a final ruling; rather *defendant* abandoned the issues of the testimony of those two witnesses. (See *People v. Ennis* (2010) 190 Cal.App.4th 721, 735-736 [holding defendant "forfeited any claim of error based upon the exclusion of the testimony" because he "decided not to pursue the matter further, and thus ... abandoned the issue," quoting *People v. Holloway* (2004) 33 Cal.4th 96, 133, for the proposition that a "'tentative pretrial evidentiary ruling ... will not preserve the issue for appeal if the appellant could have, but did not ... press for a final ruling in the changed context of the trial evidence itself,'" and observing that "the distinction between a tentative

14

ruling and a final one" "turns on whether the court has *finished* its consideration of the issue"].)

Regarding Beverly Robinson, as the People observe and defendant concedes, trial counsel never mentioned Robinson by name after defendant testified. That the trial court mentioned Beverly Robinson sua sponte, without more, did not relieve defendant of his burden to "press for a final ruling" regarding her testimony.

### 2. *Harmless Error*

We decline to reach the merits of defendant's evidentiary claims, as any error by the trial court in connection with the evidentiary rulings that defendant challenges on appeal was harmless under the standard of *People v. Watson*, *supra*, 46 Cal.2d at page 836, as defendant has not persuaded us there was a reasonable probability of a result more favorable to defendant had the alleged errors not occurred. (See *People v. Hernandez* (2011) 51 Cal.4th 733, 746 [defendant's burden]; *People v. Thompson* (2016) 1 Cal.5th 1043, 1131 [declining to reach the merits of claims of trial court error, because no prejudice].)

In *People v. Davis* (1965) 63 Cal.2d 648 (*Davis*), our Supreme Court ruled the trial court erred by excluding proffered defense testimony "to bolster [defendant's] claims by corroborating testimony" that "his knowledge of acts of violence on the part of deceased, together with other matters, were sufficient to create a reasonable fear that his life was in danger," when he killed the deceased. (*Id.* at p. 657.) But the error was harmless under *People v. Watson*, because "in spite of the exclusion there was very substantial testimony of knifings and other related acts of violence on the part of the deceased which was placed before the jury." (*Davis,* at pp. 657, 659.)

Here, defendant told the jury about six violent confrontations that he had with Parker before the August 2017 shooting. At a 2014 graduation party, Parker tried to fight defendant, and one of Parker's associates mentioned "going to get a gun." Two subsequent incidents included Parker shooting a gun.

Defendant's cousin Calvin Gardner, corroborated defendant's testimony that a confrontation at the graduation party precipitated the bad relationship between defendant and Parker, and that Gardner was with defendant outside Gardner's mother's house, when he saw Parker inside a car from which shots were fired. Gardner also testified that he knew that Parker was involved in a different shooting that happened about five minutes after Gardner and his friends "bumped into" Parker and his friends at a store.

Nicole Sowells, another relative, testified that she knew Parker because he "spent a lot of time at [her] family home," and that, after defendant told her that "Parker and his friends" "shot at" defendant, she "posted" about it on social media in February 2015.

Defendant's cousin, Shaneika Gardner, testified that she knew Parker "well" and that sometime in 2014, Parker "was driving a Camaro" and "shot in the air" when she was outside her home. She also testified that defendant told her that Parker "was shooting" during a party that defendant attended.

Hooper, defendant's son's mother, called by the People as a rebuttal witness, corroborated defendant's testimony that in 2016 or 2017, Parker chased and threatened her and defendant, forcing defendant to drive at high speeds and on the wrong side of the road.

1

2    Parker admitted that he unlawfully possessed a gun in his car at the time of the shooting. And video evidence showed Parker "sucker-punching" defendant through an open car window after their mutual combat had ended, and moments before defendant shot Parker.

3

4    Like the court in *Davis,* we are persuaded that the evidence going to Parker's "character as a violent, dangerous man, and defendant's knowledge and reasonable belief to that effect" was such that the jurors could not have entertained any doubt that Parker's character was as depicted, and further evidence on the question "would have been to no avail." (*Davis, supra*, 63 Cal.2d at p. 658.)

5

6

7    Based on the record, we conclude the trial court's evidentiary rulings did not deprive defendant of his right to present a complete defense. (See *People v. Fudge*, *supra*, 7 Cal.4th at pp. 1102-1103; *People v. Bradford*, *supra*, 15 Cal.4th at p. 1325.)

8

9

10   ECF 11-9 at 10-19.

11       The question before this court is whether these evidentiary rulings are contrary to or an

12   unreasonable application of, clearly established Supreme Court precedent, or were based on an

13   unreasonable determination of the facts of this case.  Criminal defendants have a constitutional

14   right, implicit in the Sixth Amendment, to present a defense; this right is "a fundamental element

15   of due process of law." *Washington v. Texas,* 388 U.S. 14, 19 (1967). *See also Crane v.*

16   *Kentucky,* 476 U.S. 683, 687, 690 (1986); *California v. Trombetta,* 467 U.S. 479, 485

17   (1984); *Webb v. Texas,* 409 U.S. 95, 98 (1972); *Moses v. Payne,* 555 F.3d 742, 757 (9th

18   Cir.2009).  A defendant's right to present a defense stems both from the 14th Amendment right to

19   due process and the Sixth Amendment right "to have compulsory process for obtaining witnesses

20   in his favor." *Moses,* 555 F.3d at 757.  A state violates the Sixth Amendment when it arbitrarily

21   denies a defendant the right to put on the stand a witness whose testimony "would have been

22   relevant and material to the defense." *Washington,* 388 U.S. at 23.

23       It is well-established, however, that "the right to present relevant testimony is not without

24   limitation.  The right 'may, in appropriate cases, bow to accommodate other legitimate interests in

25   the criminal trial process.'" *Rock v. Arkansas,* 483 U.S. 44, 55, (1987) (quoting *Chambers v.*

26   *Mississippi,* 410 U.S. 284 (1973)).  A criminal defendant "must comply with established rules of

27   procedure and evidence designed to assure both fairness and reliability in the ascertainment of

28   guilt and innocence." *Chambers,* 410 U.S. at 302.  Thus, a criminal defendant "does not have an

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois,* 484 U.S. 400, 410(1988). "Even relevant and reliable evidence can be excluded when the state interest is strong." *Perry v. Rushen,* 713 F.2d 1447, 1450 (9th Cir.1983). "The Supreme Court has indicated its approval of 'well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.'" *Moses,* 555 F.3d at 757.

A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process. *Drayden v. White,* 232 F.3d 704, 710 (9th Cir.2000); *Spivey v. Rocha,* 194 F.3d 971, 977–78 (9th Cir.1999); *Jammal v. Van de Kamp,* 926 F.2d 918, 919 (9th Cir.1991). A state law justification for exclusion of evidence does not abridge a criminal defendant's right to present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the accused." *United States v. Scheffer,* 523 U.S. 303, 308 (1998). *See also Crane,* 476 U.S. at 689–91 (discussion of the tension between the discretion of state courts to exclude evidence at trial and the federal constitutional right to "present a complete defense"); *Greene v. Lambert,* 288 F.3d 1081, 1090 (9th Cir.2002). "A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown,* 404 F.3d 1159, 1172 (9th Cir.2005).

Here, petitioner has failed to demonstrate that the decision of the California Court of Appeal regarding the trial court's evidentiary rulings was contrary to or an unreasonable application of, clearly established Supreme Court precedent, or that it was based on an unreasonable determination of the facts of this case. To begin with, as to the testimonies of Dorsey and Robinson, the state court reasonably concluded that the testimonies were not even excluded because petitioner abandoned the issue. ECF No. 11-9 at 17. As such, there is no final exclusionary ruling regarding the testimonies of Dorsey and Robinson for petitioner to challenge before this court. *Id.* Petitioner cannot demonstrate that the state court made an unreasonable factual determination, nor can he rebut the correctness of the state court's factual finding with

1  clear and convincing evidence.  28 U.S.C. §§ 2254(d)(1) & e(2).  Accordingly, this portion of

2  petitioner's claim must be denied.

3       Petitioner also challenges the exclusion of certain evidence he wanted to admit

4  demonstrating victim Parker's violent character and petitioner's fear of Parker, including

5  evidence of Parker's 2018 gun charge.  The Ninth Circuit has observed that the Supreme Court's

6  inquiry in the area of evidentiary rulings has been limited to "cases where defendants have argued

7  that state evidentiary rules, by their own terms, impinged upon their constitutional right to present

8  a complete defense." *Moses,* 555 F.3d at 757.  For instance, in *Holmes,* the Supreme Court struck

9  down a South Carolina rule of evidence which provided that a defendant could not introduce

10  evidence of third-party guilt if the prosecution had introduced forensic evidence that, if believed,

11  strongly supported a guilty verdict. The court reasoned that this rule, on its face, had the potential

12  to exclude even relevant evidence that had "great probative value" and would not pose an undue

13  risk of prejudice or confusion. *Holmes,* 547 U.S. at 329.

14       Here, on the contrary, petitioner's proffered evidence was excluded under California

15  Evidence Code § 352.  This well-established state rule requires evidence to be relevant in order to

16  be admissible and vests the trial court with discretion to exclude even relevant evidence if its

17  probative value is substantially outweighed by undue consumption of time, undue prejudice,

18  confusion of the issues, or potential to mislead the jury.  As set forth above, state courts have

19  "wide latitude" to exclude evidence that is "marginally relevant."  *Crane,* 476 U.S. at 689–90; *see*

20  *also Wood v. Alaska,* 957 F.2d 1544, 1549 (9th Cir.1992) ("A defendant has no right [ ] to present

21  irrelevant evidence.").  Further, "well-established rules of evidence permit trial judges to exclude

22  evidence if its probative value is out-weighed by certain other factors such as unfair prejudice,

23  confusion of the issues, or potential to mislead the jury." *Holmes,* 547 U.S. at 326.

24       The rules relied on by the trial court to exclude some of petitioner's proposed evidence of

25  self-defense are not unconstitutional on their face.  In essence, petitioner is claiming that the trial

26  court's discretionary determination to exclude certain testimony regarding Parker's violent nature,

27  and evidence of Parker's firearm charge almost a year after petitioner shot Parker, violated his

28  federal constitutional rights.  The United States Supreme Court has not "squarely addressed"

18

whether a state court's exercise of discretion to exclude testimony violates a criminal defendant's right to present relevant evidence. *Moses,* 555 F.3d at 758–59. Accordingly, the decision of the California Court of Appeal that the trial court's evidentiary ruling did not violate the federal Constitution is not contrary to or an unreasonable application of clearly established United States Supreme Court precedent and may not be set aside. *Id. See also Wright v. Van Patten,* 552 U.S. 120, 126, 128 S.Ct. 743 (2008) (per curiam) (relief is "unauthorized" under § 2254(d)(1) when the Supreme Court's decisions "given no clear answer to the question presented, let alone one in [the petitioner's] favor," because the state court cannot be said to have unreasonably applied clearly established Federal law).

In any event, the exclusion of the evidence in question did not result in a violation of petitioner's right to present a defense. On the contrary, as the state court confirmed, substantial evidence regarding Parker's violent nature was admitted in support of petitioner's theory of self-defense, including testimony from petitioner himself and four additional witnesses. ECF No. 11-9 at 18-19. Parker's gun charge was permitted to be used as impeachment evidence. *Id.* at 12. Additionally, Parker admitted that he was in unlawful possession of a gun at the time of the shooting, and video evidence showed Parker punching defendant through an open car window. *Id.* at 19. As such, Parker's violent character, and defendant's knowledge of such, was clearly communicated to the jury. The trial court rulings did not deny petitioner an opportunity to present a theory of self-defense, and thus petitioner cannot demonstrate that the rulings had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Petitioner's claim must be denied.

### ii. Claim II

Petitioner next argues that the prosecutor committed misconduct by granting victim Parker immunity, but not one of petitioner's companions, and then arguing in his closing argument that petitioner's testimony was uncorroborated and that that he did not need to call Parker as a witness. The state court rejected this claim as follows:

> Defendant argues that, "in light of closing arguments to the jury," the prosecution
> violated defendant's federal constitutional rights by immunizing Parker but not one

19

of defendant's companions at the shooting, who would have testified that Parker "uttered a threat as he was walking away" from defendant.

The People argue this claim is forfeited because defendant did not object on these grounds in the trial court. We conclude this claim is forfeited on appeal.

**A.** *Additional Background*

During trial, Parker was facing a pending gun possession charge in another jurisdiction. Parker testified after the prosecutor gave him use immunity.

During in limine proceedings, the prosecutor moved to exclude anticipated testimony by Malcolm Brown--who was in the car with defendant before defendant shot Parker--that he saw an "'imprint in the shape of what [he] believe[d] was a gun,'" and "'felt that [he] was in danger' " " 'because [Parker] walked off mad mumbling threats.'" Also, the prosecutor noted that Brown's attorney told the prosecutor he believed Brown still had liability for the shooting. Defense counsel explained that he "believ[ed] [he] w[ould] call" Brown. Brown's attorney told him that he was going to advise Brown to assert his Fifth Amendment right against self-incrimination because the federal government could prosecute Brown for his conduct around the time of the shooting.

During trial, defense counsel reiterated that he planned to call Brown as a witness. Brown's counsel stated he advised Brown to assert his Fifth Amendment right and "refuse to answer any and all questions." Under oath outside the presence of the jury, Brown confirmed he would "refuse to answer any question" regarding anything that occurred on August 9, 2017.

Defense counsel asked the trial court to grant Brown "judicial immunity." The trial court replied it had no "jurisdiction" to grant that request. The trial court asked the prosecutor, "[D]o you agree?" The prosecutor agreed that a "judicial grant of immunity ... doesn't exist." Defense counsel disagreed, asserting that "judges in this courthouse ... have granted judicial immunity." The trial court replied: "If, in fact, the [c]ourt does have discretion, I choose not to exercise it in this case."

During closing argument to the jury, the prosecutor argued he did not "really need" Parker's testimony to prosecute this case, but he put Parker "on because [the prosecutor] wanted [the jury] to see everything. [He] didn't want to hide anything from [the jury]." And then (as explained earlier in this opinion) he asked the jury to consider whether defendant's testimony was corroborated.

Defense counsel did not object.

**B.** *General Principles*

"In [*People v.*] *Masters* [(2016) 62 Cal.4th 1019], following the [*U.S. v.*] *Quinn* [(3d Cir. 2013) 728 F.3d 243] court's lead, our high court held that 'California courts have no authority to confer [judicial] use immunity on witnesses.' [Citation.] ' "[T]he power to confer immunity is granted by statute to the executive." ' " (*People v. Hull* (2019) 31 Cal.App.5th 1003, 1023 (*Hull*).)

"While judicial immunity has been foreclosed, ... prosecutorial immunity could be compelled as a requirement of due process if the prosecutor's refusal to grant immunity amounts to prosecutorial misconduct." (*Hull, supra*, 31 Cal.App.5th at p. 1023, fn. omitted.) "'[D]ue process may compel a defense witness to be immunized: If a defendant can show that the prosecutor refused to grant

1   immunity "with the deliberate intention of distorting the judicial factfinding
    process," a retrial is necessary.'" (*Id.* at p. 1024.)

2

3   "As a general rule a defendant may not complain on appeal of prosecutorial
    misconduct unless in a timely fashion -- and on the same ground -- the defendant
    made an assignment of misconduct." (*People v. Samayoa* (1997) 15 Cal.4th 795,

4   841.) "A defendant will be excused from the necessity of either a timely objection
    ... if [it] would be futile. [Citations.]" (*People v. Hill* (1998) 17 Cal.4th 800, 820.)

5

    **C. Analysis**
6   Whether viewed as a claim of prosecutorial misconduct during closing argument,
    or "prosecutorial 'error' rather than 'misconduct'" (as defendant maintains) in

7   failing to grant immunity to Brown, or a hybrid of the two, this claim is forfeited
    on appeal because defendant did not preserve it. (See *People v. Williams* (2008) 43

8   Cal.4th 584, 624 [defendant claims that "a prosecutor's refusal to grant immunity
    to a defense witness when the refusal was undertaken 'with the deliberate intention

9   of distorting the fact-finding process'" forfeited on appeal because he "failed to
    raise any of them in the trial court"].) Defense counsel did not ask the prosecutor

10  to grant immunity to Brown and did not object to the prosecutor's closing
    arguments.

11

12  To the extent defendant's contention that "[t]here is no reason to believe a
    'properly sought' request to the prosecution would have resulted in immunization"

13  is an argument that his claim is not forfeited because it would have been futile to
    explicitly seek prosecutorial immunity for Brown, the argument is unpersuasive

    because it is speculative. (Cf. *U.S. v. Quinn*, *supra*, 728 F.3d at pp. 259-260 ["If
14  the Government *refuses* to immunize the witness in violation of the defendant's
    due process right, the trial court can dismiss the charges against the defendant"],

15  italics added, fn. omitted.)

16  Further, regarding the failure to object to the prosecutor's closing arguments,
    "'[t]he primary purpose of the requirement that a defendant object at trial to

17  argument constituting prosecutorial misconduct is to *give the trial court an*
    *opportunity*, through admonition of the jury, to correct any error and mitigate any

18  prejudice.'" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328, italics added.)
    Defendant did not give the trial court an opportunity to correct and mitigate any

19  prejudice arising from the error defendant now alleges.

20  ECF No. 11-9 at 19-22.

21          Respondent maintains here that this claim is procedurally defaulted, and thus not

22  amenable to federal habeas review.  Under the procedural default rule, federal courts must

23  generally decline to review federal claims where the state court decision under review rejected the

24  claims based on a state procedural rule that was independent of the federal issues and adequate to

25  support the judgment.  *Coleman v. Thompson,* 501 U.S. 722, 729 (1991); *Bennett v. Mueller,* 322

26  F.3d 573, 580 (9th Cir.2003).  Where the state court's rejection of a claim was based on an

27  adequate and independent state procedural rule, a petitioner may obtain federal review only by

28  demonstrating either (1) cause for the procedural default and prejudice or (2) that the failure to

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

review the claims will result in a fundamental miscarriage of justice. *Coleman,* 501 U.S. at 750. The Ninth Circuit has found that California's rule that an issue not objected to at the time it arose is nonreviewable on appeal (the "contemporaneous objection" rule) may be grounds for procedural default. *Paulino v. Castro,* 371 F.3d 1083, 1092–93 (9th Cir.2004) (petitioner's claim that trial court failed to adequately respond to a jury question was procedurally barred because trial counsel did not contemporaneously object and petitioner failed to show that the contemporaneous objection rule was unclear, inconsistently applied or not well-established).

To determine in this case whether petitioner's claims are procedurally defaulted based on this state procedural rule, the court must follow the burden-shifting framework established in *Bennett.* Under the *Bennett* framework, the state bears the initial burden of pleading the existence of an adequate state procedural ground as an affirmative defense. *Id.* at 586. Once the state does so, the burden shifts to the petitioner to assert "specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule." *Id.* If the petitioner does so, the burden then shifts back to the state to ultimately prove that the state procedural rule is nevertheless adequate. *Id.*

In this case, the state has pleaded as an affirmative defense and argued that the contemporaneous objection bar is independent and adequate. Resp.'s Answer at 19-10; ECF No. 12 at 17-20. Petitioner was thus required to make some showing that this procedural bar is inadequate. He has not done so, having filed no reply to respondent's answer and supporting memorandum. Nor has petitioner made any showing of cause for the procedural default. Accordingly, the court concludes that petitioner's claim that the prosecution violated defendant's federal constitutional rights by immunizing Parker but not one of defendant's companions at the shooting, has been procedurally defaulted.

*iii. Claim III*

Lastly, petitioner argues that cumulative effect of the foregoing, alleged errors during his trial violated his due process rights. The state court rejected this argument:

/////

22

1
2

Defendant's third claim is that "cumulative errors" of the trial court and prosecution deprived him of his right to present a complete defense in violation of his due process rights.

3
4

We reject this claim because defendant's trial was not fundamentally unfair.  (See *People v. Jenkins* (2000) 22 Cal. 4th 900, 1056 ["Considered together, any errors were nonprejudicial," and defendant's trial "was not fundamentally unfair"].)

5

ECF No. 11-9 at 22.

6

   "The Supreme Court has clearly established that the combined effect of multiple trial

7

court errors violates due process where it renders the resulting trial fundamentally unfair."  *Parle*

8

*v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298

9

(1973)).  "Cumulative error applies where, although no single trial error examined in isolation is

10

sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors has still

11

prejudiced a defendant." *Jackson v. Brown*, 513 F.3d 1057, 1085 (9th Cir. 2008) (internal citation

12

and quotations omitted).

13

   Here, there was no error with respect to petitioner's individual claims.  Thus, petitioner is

14

not entitled to relief based on cumulative error.  *See United States v. Solorio*, 669 F.3d 943, 956

15

(9th Cir. 2012) ("There can be no cumulative error when a defendant fails to identify more than

16

one error."); *United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001) ("if there are no errors or a

17

single error, there can be no cumulative error").  This claim must therefore be denied.

18

   **III. Recommendation**

19

   For the reasons stated above, it is hereby RECOMMENDED that the petition for writ of

20

habeas corpus be DENIED.

21

   These findings and recommendations are submitted to the United States District Judge

22

assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen days

23

after being served with these findings and recommendations, any party may file written

24

objections with the court and serve a copy on all parties. Such a document should be captioned

25

"Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

26

within the specified time may waive the right to appeal the District Court's order.  *Turner v.*

27

*Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In

28

his objections petitioner may address whether a certificate of appealability should issue in the

event he files an appeal of the judgment in this case. *See* Rule 11, Federal Rules Governing §

2255 Cases (the district court must issue or deny a certificate of appealability when it enters a

final order adverse to the applicant).

Dated: January 5, 2023.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE